PEOPLE *v.* WELLMAN.

1. CONSPIRACY—VIOLATION OF LAW.
   The gist of the offense of conspiracy is an agreement to accomplish a violation of the law.

2. SAME—ABORTION.
   Conspiracy to commit abortion requires evidence showing some agreement, understanding, plan, design, or scheme to commit acts which are intended to abort a pregnancy unlawfully (CL. 1948, § 750.14).

3. SAME—ABORTION—EVIDENCE.
   Evidence of an agreement between defendant physician and pregnant woman, and between defendant physician and third

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 16 Am Jur 2d, Conspiracy §§ 1, 7.
[2] 16 Am Jur 2d, Conspiracy §§ 7, 34.
[3, 4] 16 Am Jur 2d, Conspiracy §§ 34, 42.
   1 Am Jur 2d, Abortion § 34.
[5] 5 Am Jur 2d, Appeal and Error §§ 839, 883.

person, not a medical practitioner, that pregnant woman would undergo an abortion *held*, to establish conspiracy to commit abortion even though the abortion finally accomplished was caused by a method opposed by defendant physician (CL 1948, § 750.14).

4. SAME—ABORTION—EVIDENCE.

Evidence that defendant physician conspired to commit unlawful abortion *held*, shown beyond reasonable doubt, where defendant physician agreed with pregnant woman patient that she should have abortion, and called third person, not a medical practitioner, in another city several times in an attempt to get third person to arrange abortion by a certain method, although abortion was eventually done by method opposed by defendant (CL 1948, § 750.14).

5. CRIMINAL LAW—EVIDENCE—JUDGE AS TRIER OF FACT.

Appellate court will not set aside finding of guilt in criminal case by trial judge sitting without jury, when there was evidence presented to sustain finding of guilt beyond a reasonable doubt.

Appeal from Kent; Hoffius (Stuart), J. Submitted Division 3 January 4, 1967, at Grand Rapids. (Docket No. 1,163.) Decided April 25, 1967. Leave to appeal denied July 13, 1967. See 379 Mich 771.

Dr. William J. Wellman was convicted of conspiracy to commit abortion. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *S. J. Venema,* Assistant Prosecuting Attorney, for the people.

*Warner, Norcross & Judd (Harold S. Sawyer* and *Wallson G. Knack,* of counsel), for defendant.

BURNS, J. The defendant, an osteopathic physician and surgeon who specialized in treating problems relating to obesity, was found guilty by the

trial judge, sitting without a jury, of conspiracy
to commit an abortion.[1]

One of the defendant's patients, Georgette Vander-
Bos, who was not married, told him that she was
pregnant. She did not wish to raise the child as
her own, and she did not wish to subject the child
to a life through adoption. The patient further in-
formed the defendant that she would kill herself
before she would have the baby and had, therefore,
arranged for an illegal abortion in the city of Grand
Rapids.

The defendant advised her that the type of abor-
tion (paste type) which she had planned was too
dangerous and that he would try to find a doctor who
would perform an abortion. Whether the abortion
contemplated would be a legal therapeutic abortion
or an illegal D and C (dilation and curettement) is
disputed on the record.

The doctor explained his decision to render as-
sistance as follows:

"Well, she said, 'You certainly aren't offering me
much help. Here you have advised me against a plan
of action that would terminate my pregnancy. You
offer nothing in—as an alternative. You are of ab-
solutely no help.' Well, at this time I made a judg-
ment. Here I was faced with a woman who was dis-
traught, upset to the point where she'd go to a back-
door abortionist. She would threaten suicide as an
alternative to abortion. I felt—and here I made
my biggest mistake in evaluating the patient—I felt
here was a woman that was possibly deserving of

---

[1] CL 1948, § 750.14 (Stat Ann 1962 Rev § 28.204) prohibits illegal
abortions. CLS 1961, § 750.505 (Stat Ann 1954 Rev § 28.773) pro-
vides: "Any person who shall commit any indictable offense at the
common law, for the punishment of which no provision is expressly
made by any statute of this State, shall be guilty of a felony."
*People* v. *Smith* (1941), 296 Mich 176, 180 states: "A conspiracy
to commit a crime was an indictable offense at common law, and
such conduct is made a felony by this section of the statute."

every bit of consideration and attention the medical
profession could offer her. * * *

"I felt the woman might well qualify and deserve
a therapeutic abortion. Here we are faced with a
problem where some doctors would resist performing
or recommending the performance of a therapeutic
abortion on grounds of mental health, to the very
end feeling that because of either moral or religious
conviction the patient's life would be sacrificed be-
fore this would be done, or before they would recom-
mend that it would be done. I knew of no one in
Grand Rapids that I might refer the woman to, a
licensed physician who would be most sympathetic
with her problem and go to possibly every length to
get the benefit of good medical treatment for her.
However, historically it is reputed in Detroit that
there have been doctors that would go to every
length to see that the individual was given every
benefit of doubt in treatment of this type case.

"I knew of no doctors in Detroit that I could send
the woman to. However, my practice has been
rather limited and I have had little contact with
other physicians particularly in Detroit. However,
I did know a businessman in Detroit whom I felt
would be in a position to come up with the name of
a doctor that this woman could consult who would
be most apt to be sympathetic with her problem and
go to every length to recommend treatment for
her."

The businessman referred to above was Dave
Paschall, a tailor in Detroit. The defendant tele-
phoned Paschall and told him that he disapproved
of the operation which Mrs. VanderBos had planned
on obtaining from an untrained person and that he
had told her that a D and C (abortion by means of
dilation and curettement) was the only acceptable
method in legitimate practice. The doctor said, "I
would like to refer her to a physician who would be
apt to be sympathetic to her problem." Paschall

replied that he would inquire and see if he could find the name and phone number of a physician in the area. Later that same day Wellman called again, and when Paschall informed him that he had not located anybody, the doctor said that he would let Mrs. VanderBos call in the future; nevertheless, three days later, Wellman called a third time to inquire as to Paschall's progress.

After Mrs. VanderBos had talked to Paschall she again consulted the defendant and testified as to that consultation:

"I told him—I told Dr. Wellman that Dave called me back, Dave told me he couldn't find what Dr. Wellman want for me; the only kind he could find was a paste, chemical type, that those are the type— that doctor was out of town so he couldn't give it to me. So that Dave wanted me to ask Dr. Wellman if he thought it would be all right for me to have the paste type of abortion. So, Dr. Wellman asked me how much he was going to charge me. I told him $450 for the paste type or $500 for the type that you want me to have. But he—that's one thing that Dave couldn't find. Dr. Wellman told me it was way too much money, that I shouldn't have to pay that much money, to tell Dave that he shouldn't charge me that much. And he told me if that's only kind he can find, you tell Dave that I don't want you to have the paste type; I want him to find you a good doctor who give you the therapeutic D and C abortion. So I told him fine; we call back Dave. So I went home and I called Dave again and I told him what Dr. Wellman say. And Dave say, 'Well, I'm sorry but I just can't find' —"

Thereafter, 3 illegal attempts were made to terminate the pregnancy, and finally, approximately 6 months after the last abortion attempt, a Grand Rapids physician removed a mummified dry fetus which was protruding through the cervix and admitted

Mrs. VanderBos to a hospital where a D and C was performed.

The defendant appeals to this Court claiming that the evidence does not prove beyond a reasonable doubt that the accused was guilty of conspiracy.

The gist of the offense of conspiracy is an agreement to accomplish a violation of law. *People* v. *Smith* (1941), 296 Mich 176. To establish a conspiracy to commit abortion would require evidence indicating some agreement, understanding, plan, design, or scheme to commit acts which are intended to unlawfully abort a pregnancy.

It is apparent from the conversations between Mrs. VanderBos and the doctor and between the doctor and Paschall, a tailor in a distant city, that there was a meeting of the minds that Georgette VanderBos should undergo an abortion. However,

"The unqualified word 'abortion' in its primary meaning is the equivalent of miscarriage, and does not in the abstract necessarily import crime. Our penal statute * * * adopts the synonymous term 'miscarriage,' and recognizes in its provisions that, causing or procuring the same, may, under certain circumstances, be innocent, and even necessary to preserve life." *Gilchrist* v. *Mystic Workers of the World* (1917), 196 Mich 247, 253.

The object of the conspiracy was allegedly to violate CL 1948, § 750.14 (Stat Ann 1962 Rev § 28.204) which provides:

"Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

"In any prosecution under this section, it shall not be necessary for the prosecution to prove that no such necessity existed."

There is no doubt that the type of abortion ultimately attempted was not the type envisioned by the defendant. The trial judge found:

"In this particular case there is no showing that Dr. Wellman received any of the proceeds. In this case it is apparent that Mrs. VanderBos was about ready to go through an abortion here in this community. In this case it is apparent further that she had no other means of accomplishing it at that particular time so she consulted the man with whom she was receiving regular treatment.

"This man, who is professionally skilled, apparently, instead of referring this woman to a local practitioner, calls a person in Detroit with whom he was acquainted by reason of the fact that his office was located next door. * * * On three separate and distinct occasions there is testimony that he made calls to Mr. Paschall. It is apparent that he discussed with Mr. Paschall the matter of having an abortion. He says now that he wanted her, because of her condition—which he got only from statements from her—to have what he terms a therapeutic abortion. She says that she never heard the term until last Thursday or Friday, although it is true that she did use the term 'therapeutic abortion' in her direct examination yesterday morning on the witness stand without any prompting by the prosecutor or without any prompting or questioning of her.

"But this man calls a man who is engaged in the tailoring businesss, the selling of clothes, in the Farwell Building, to arrange for an abortion. It is apparent from the conversation that has been related both by Dr. Wellman and by the results of the conversation which were related by the statements made by Mr. Paschall to Mrs. VanderBos that there was

talk about the type of abortion that should be performed.

"For this court to believe that Dr. Wellman was going out and trying to get what we will use, for lack of a better term, an ethical or approved type of abortion for this type of person is almost impossible of belief. It would be so simple for him to refer this particular individual to reputable physicians in his own field of practice to see if they could find any of the reasons which would justify the commission of an abortion. There are times when, of course, medical men can perform abortions. At this time his analysis is that he only knew that she was pregnant from what she told him. It is his claim further that she only advised him that she would take her own life because she did not want to have the baby and place it out for adoption and there was no possibility of her getting married. I am sure that most unmarried women who were about ready to have children are inclined and frequently tell their physicians that they are ready to take their own life. This does not in my opinion justify any type of abortion. This does not in my opinion justify, without further consideration, the referring of this woman to a man by the name of Dave who, by his testimony as related by Mrs. VanderBos, said that his wife had had several abortions herself. This man then definitely and distinctly refers her to a man that he believes can obtain an abortion. He does not have and he is not a party to the conspiracy with Wolke and Bitker,[2] but he set in motion the whole of the events which transpired thereafter. He put in the phone call which to me is sufficient to say that there was a combination or an agreement of two or more persons to commit an unlawful act."

The Supreme Court in *People* v. *Szymanski* (1948), 321 Mich 248, 254, stated:

---

[2] These were the persons who allegedly attempted to illegally terminate the pregnancy.

"The trial judge saw and heard the witnesses and he was in a far better position than is this Court to determine their credibility.  There was evidence to support the finding that defendant was guilty beyond a reasonable doubt.  Such being the case, this Court may not set aside the verdict on the ground that the evidence was not sufficient to sustain it."

Judgment affirmed.

FITZGERALD, P. J., and QUINN, J., concurred.